[Twigg v. Sheehan.]

## Twigg *versus* Sheehan.

1. The organic law of the Roman Catholic Church is to the effect that the church is bound to provide a decent support for its priests. This, however, does not constitute an implied contract on the part of the bishop of a diocese to support the priests therein. No priest can, therefore, in the absence of an express contract, bring assumpsit against his bishop for an amount sufficient decently to support him.

2. It is in the discretion of bishops of the Roman Catholic Church to decide whether the manner in which a priest performs his official duties, and the nature of his walk and conversation in life are such as to entitle him to support from the church. What circumstances are such as to warrant a bishop in deciding that a priest is not so entitled, considered.

3. The relation between a Roman Catholic bishop and priest is not that of hirer and hired, or principal and agent.

October 19th 1882. Before SHARSWOOD, C. J., MERCUR, GORDON, PAXSON, TRUNKEY, STERRETT and GREEN, JJ.

ERROR to the Court of Common Pleas No. 2 of *Allegheny county*: Of October Term 1882 No. 66.

Assumpsit, by Rev. Patrick M. Sheehan, against The Right

[*Tuigg v. Sheehan.*]

Rev. John Tuigg, Roman Catholic bishop of the diocese of Pittsburgh, to recover $2,400—alleged to be due the plaintiff as "salary for maintenance as a priest of the diocese," for three years, during which he was refused a congregation or support by the defendant.

By agreement of the parties, the case was referred to White, J., under the Act April 22d 1874, who found the facts to be as follows: In 1857 the plaintiff was duly ordained a priest in the diocese of Pittsburgh. In the latter part of 1870, owing to ill health, he resigned a congregation at Cameron's Bottom, Indiana county, of which he was then in charge under Bishop Domenec, and obtained a leave of absence until he should be restored to health. Subsequently Bishop Domenec sent him two letters authorizing him to officiate as priest, and acting on this authority he did so officiate at numerous places out of the diocese, up to October 1875. He then returned to Pittsburgh and applied to Father Hickey, the Vicar General of the diocese, for a congregation, but without success. About ten days after plaintiff's return to Pittsburgh, Bishop Domenec went to Rome, where he remained until the following March. During his absence a portion of the diocese of Pittsburgh was taken and formed into a new one called the diocese of Allegheny, over which Bishop Domenec was installed on his return in March 1876, while Rev. John Tuigg was consecrated Bishop of the diocese of Pittsburgh. "Cameron's Bottom" was included in the diocese of Allegheny. While Bishop Domenec was absent, the plaintiff renewed his application to Father Hickey, who was then acting for Bishop Domenec, for a congregation, but none was given him.

Upon the consecration of Bishop Tuigg plaintiff applied to him for an appointment, which was refused: 1st. On the ground that plaintiff was not a member of the Diocese of Pittsburgh: 2d. That the bishop was not satisfied of the plaintiff's fitness for the charge of a congregation, and required some evidence on that point, especially as to his deportment during his absence from the diocese.

Plaintiff thereupon wrote to Archbishop Wood, of the diocese of Philadelphia, to intercede for him, but without effect, and he remained in Pittsburgh unemployed and without support from the church, until April 1877, when he went to Rome, where he stayed until September 1878. During this period Bishop Tuigg received three letters from the Prefect of the Propaganda at Rome, concerning the plaintiff and referring to his being addicted to the vice of intemperance. The last letter, dated August 24th 1878, stated that the plaintiff had been directed to return to America, and recommended him to the clemency of the bishop. Plaintiff left Rome in September, 1878 but

remained in New York and Virginia until June 1879, when he returned to Pittsburgh, having previously announced his coming by letter, and again applied to Bishop Tuigg for work or support, which was refused.

The plaintiff thereupon brought this suit for salary at the rate of $800 per annum during the years 1876, 1877 and 1878.

WHITE, J., in an opinion filed, held, that although the plaintiff was not entitled to recover the sum claimed, which was the amount allowed, under the statute law of the diocese, to a priest in charge of a congregation, yet that he was entitled to $800, under the common law of the church, which guaranteed him a support, when he was ordained a priest. The court accordingly entered judgment for plaintiff in this amount.

The defendant thereupon took this writ, assigning for error (*a*) the refusal of the court to rule that it had no jurisdiction; (*b*) the refusal of the court to hold, that as no promise, express or implied, had been proved or claimed to have been made by the defendant to the plaintiff, to employ the latter on a mission at the salary specified, therefore assumpsit would not lie; (*c*) the finding of the court that, under the law, there is an implied obligation on the part of a bishop to provide support for a priest in his diocese; (*d*) the entry of judgment for plaintiff.

*Charles F. McKenna* (with him *John Barton*), for plaintiff in error.—It is well settled in Pennsylvania that in matters of faith, morals and discipline, churches are free to act and legislate, without interference of the civil courts; their jurisdiction over church questions being restricted to matters relating to property. The civil courts therefore have no jurisdiction in this case: German Reformed Church *v.* Commonwealth, 3 Barr 282; Henderson *v.* Hunter, 9 Sm. 343; Cheeney *v.* Bishop of Ill., 58 Ill. 509. No promise to support the plaintiff below, or to pay him a salary, was found to have been made by the defendant. On the contrary, an express refusal by the bishop to do so was found by the court. The relations of bishop and clergy imply no promise of support upon which a contract can be based, which will sustain an action of assumpsit: Ross *v.* Vertin, 46 Mich. 457. If Father Sheehan should violate his vows of perpetual service to the diocese, or of celibacy, or his promise to refrain from secular pursuits, it would hardly be contended that assumpsit would lie against him by the bishop for his failure to fulfill his obligations to the church. It is evident, therefore, that the element of mutuality, so essential to contracts in civil law, does not exist in this case.

[Tuigg *v.* Sheehan.]

*Thomas M. Marshall* and *A. S. D. Watterson,* for defendant in error.—At his ordination, a priest renounces his right to perform secular labor and promises to hold himself subject to the call of the bishop, for church duties. In return, a title to decent support is guaranteed him. This is an essential without which, by the laws of the church, ordination is impossible. America being a missionary jurisdiction, having no benefices, the priest must look to the bishop for this support; and there is an implied contract between a bishop and a priest that the bishop shall supply him with the means of existence. For the breach of this contract assumpsit will lie. A priest's title, is property which can only be taken from him by trial, conviction and sentence: Stack *v.* O'Hara, 2 Out. 213.

(The canon law bearing on this case was cited at great length in the paper books.)

Mr. Justice PAXSON delivered the opinion of the court, November 20th 1882.

This case has been so completely buried under a load of ecclesiastical lore that at first sight it would seem to present several points of apparent difficulty. When, however, it is examined critically, the supposed difficulties disappear, and the only real question in controversy can be disposed of by the application of a few well understood principles of law.

The case below was this: The plaintiff, Rev. Patrick M. Sheehan, is a priest connected with the catholic church, and brought an action of assumpsit against the defendant, the Rt. Rev. John Tuigg, bishop of the diocese of Pittsburgh, to recover the sum of $2400, being three years' salary as priest, at the rate of $800 per year. The suit was not based upon actual services, for it was conceded that during the period within which compensation was claimed no services had been performed, but upon the duty to support its priests which it was alleged was a part of the law of the catholic church. The statute law of the diocese as found by the learned court below fixes the salary of a priest in charge of a parish at $800 per annum, the amount claimed by the plaintiff. The court held that he could not recover this salary under the statute but awarded him the sum of $800 for the three years under "the common law of the church which guarantees him a decent support."

It appears from the facts found by the court that about the close of the year 1870, the plaintiff resigned his congregation or mission at Cameron's Bottom, Indiana county, Pa., on account of ill health. The resignation was accepted by Rev. John Hickey, who was at that time administrator of the diocese. Subsequently. Father Hickey gave the plaintiff leave of absence until his health should be restored. He was absent until 1875,

[Tuigg *v.* Sheehan.]

and returned to Pittsburgh in October of that year. Bishop Domenec was at that time bishop of the diocese of Pittsburgh. From 1875, up to the consecration of the defendant as bishop of this diocese, some negotiations appear to have been going on with a view of assigning the plaintiff to some ecclesiastical duty. Nothing came of it however, and after the date of Bishop Tuigg's consecration the plaintiff applied to him by letter, and otherwise for an appointment to a mission or congregation. This request was refused by the bishop for the reasons : 1st. That the plaintiff was not a member of the diocese of Pitts- burgh, but properly belonged to Allegheny : and 2d. That the bishop was not satisfied of plaintiff's fitness for the charge of a congregation, and required some evidence on that point, especi- ally of his deportment during his absence from the diocese. It appears that the bishop had evidence that during plaintiff's absence " his course of life had not been regular." After this refusal of Bishop Tuigg, the plaintiff wrote to Archbishop Wood of Philadelphia, to intercede in his behalf, but without effect. He then went to Rome and made an informal complaint against the bishop. He remained in Rome until 1878. While there, Bishop Tuigg received three letters from the Prefect of the Propaganda in Rome, in which reference was made to the plaintiff's irregular habits. The plaintiff left Rome in 1878, stopped a few days in London, landed in New York, where he remained for several weeks and then went to his mother's in Virginia, where he resided until the following spring. He came to Pittsburgh in June 1879, and made another demand upon the bishop for work or a support and was refused. Where- upon he brought this suit against him, claiming three years' salary.

The learned court further found that " the plaintiff was not tried and convicted of any offence ; he was not notified of any charges or complaints against him ; he was not removed from any mission, congregation or post; nor was he formally sus- pended from the office, functions, rights or privileges of a priest. He was simply denied an appointment to any work, and refused any support by the defendant, on the ground that plaintiff was not a priest of the diocese, or if he was, he was unfit to have charge of a mission or congregation."

That the defendant acted in entire good faith and from con- scientious motives is not only shown by the evidence but is found by the court below. The learned judge says in the con- clusion of his findings of facts : " I take great pleasure in saying, and so find, if it be material, that there is no evidence that Bishop Tuigg, in the treatment of the plaintiff, was influenced by any personal, hostile or unkind feeling toward him. He acted from a conscientious sense of duty. He did not regard

[Tuigg *v.* Sheehan.]

Father Sheehan as a priest of the diocese, for whom he was bound to provide, but considered him more properly belonging to the diocese of Allegheny. From what he knew, or had heard, he doubted his fitness for the charge of a congregation. He required evidence of his fitness, either by letters, or trial in a religious house, before he would give him work or engage to support him ; and the facts of the case justified these doubts and caution. Father Sheehan had been absent from his diocese for more than four years, and when he returned he brought no letters or evidence as to his deportment during his absence. His non-employment and non-exercise of the priestly functions, for six months immediately preceding the advent of the defendant as bishop of the diocese, were calculated to excite suspicion. His long delay in reporting himself after being sent home from Rome was inexcusable, and no doubt had great influence in defeating his application in 1879."

. Under these circumstances, is the bishop liable in an action at law to the plaintiff for his salary, or an equivalent in the way of support? There are many duties in life, which, in the absence of a contract, the law will not enforce specifically, nor will it give compensation in damages for the breach thereof. Had the plaintiff sought redress within his church his rights would have been determined by the laws of the church. When, however, he seeks the aid of the civil courts he is to be treated precisely as any other citizen, and his rights determined by the same standard. He has brought an action of assumpsit and to sustain it he must show a contract express or implied. Has he shown such contract? If so, when, where, and with whom was it made, and what were its precise terms? It certainly was not made with Bishop Tuigg, for the reason that when he was consecrated bishop in 1876, the plaintiff was without a congregation and had been absent for several years. Was it made with Bishop Domenec, the predecessor of the defendant in his office of bishop of Pittsburgh? There is no such evidence and there is no such finding by the court below. All that can be and was claimed is that the church is bound by its own organic law to provide a decent support for its priests. That it is the duty of a religious denomination to provide a support for its teachers is a fact that is recognized with a few exceptions all over Christendom. It is said, however, to be especially binding upon the Catholic Church, for the reason that its priests are debarred by its canons, and by their ordination vows, from engaging in any secular employment, and that from this vow not even the bishop can absolve them. However binding such a duty may be *in foro conscientiæ*, when it comes to its enforcement in a court of law the plaintiff must show a contract. With all the ingenuity and learning that have been exhibited

in this case no contract relation has been established.   The duty of the church to support its priests bears some, analogy to the obligation recognized by several religious denominations to support their own poor.   Yet it has never been supposed that this duty involved a contract relation which would sustain an action at law for its non-performance.

The plaintiff alleges that the law of his church creates a duty from which springs an implied contract on the part of the bishop to support him so long as he remained a priest of the diocese, and was not convicted of any offence, or suspended from his priestly functions.   Is this position sound?   The obvious test is to reverse the position and treat this as a suit by the bishop to recover damages from the plaintiff for a failure to perform his priestly functions or any duty prescribed by his ordination vows.   No one will contend that such a suit could be maintained.   The plaintiff can lay down his office and its duties at pleasure.   For doing so he could only be visited with ecclesiastical censure and such punishment, if any, as the canons of the church prescribe.   The bishop would have no remedy in the courts of law.   It will thus be seen that there is no mutuality.

If we assume a contract relation between the bishop and the plaintiff it must be either that of principal and agent or hirer or hired.   This involves the right of either party to end the contract.   As before said the plaintiff may end it at pleasure and the bishop would have no remedy in damages.   The plaintiff can have no higher right.

The duty of the church to support its priests must have some qualification, even *in foro conscientiæ.*   The right to support may depend upon the manner in which the priest performs his official duties, and the nature of his walk and conversation in life.   He may in many ways render himself unfit for his holy calling and yet avoid a conviction for crime, or perhaps removal from office.   The usefulness of a priest may be destroyed, and yet he may truly say I have violated no law of the land or of the church.   There must be a discretion left somewhere to decide such questions, and we see no authority competent to do so but the bishop.   To throw such a question into the jury box in a common law proceeding would be as novel as it would be unsafe.   The bishop exercised his discretion in this instance, and the court below set his judgment aside.   Yet upon the finding of facts by the learned judge, the bishop was fully justified.   If a priest by reason of his equivocal conduct becomes unfitted to perform his priestly functions, it is difficult to see by what rule of ecclesiastical or civil law he is entitled to a salary or support.

It would be doing a wrong to the Catholic Church and degrade

5 OUTERBRIDGE—24

[Tuigg *v.* Sheehan.]

its priesthood from their high position were we to hold that the relation between the bishop and his priest was that of hirer or hired, of employer and employee. The moving consideration in such contracts is the pecuniary advantages flowing from the relation. When a priest dedicates his life to the church and takes upon himself the vows of obedience to its laws, he is presumed to be actuated by a higher principle than the hope of gain. Where he has an actual contract with his congregation or his bishop for a salary, it may be enforced as any other contract ; but where he relies upon the duty of his church to support him he must invoke the aid of the church if he seeks redress. The civil courts wisely decline to interfere in ecclesiastical controversies except where rights of property are concerned. In the latest case before this court upon this subject it was said : "The profession of a priest or minister of any denomination is held subject to its laws; the priest acquired it by compact, and is not exempt from the proper discipline and authority of his church ; he has no property in his profession that shields him from the consequences of his broken vows and compacts :" Stack *v.* O'Hara, Pittsburgh Legal Journal vol. xii. N. S. 65. To the same effect is Cheeney *v.* Protestant Episcopal Bishop of Illinois, 58 Ill. Rep. 509. The recent case of Rose *v.* Vertin, 46 Mich. 457, closely resembles the one in hand. It was there held that the priest could not recover his salary from the bishop ; that the latter was merely his superior officer in the church, clothed with the appointing power, and that the exercise of such power in assigning the priest a congregation did not make the bishop liable. It was said by GRAVES, J. : "The main facts in the case are undisputed and the only question is concerning their effect ; and in my opinion they show distinctly that the relation between Bishop Wrack and the priest was never that of hirer and hired in any sense, implying an obligation on the bishop to pay the priest. The bishop was the priest's superior, and according to the established order of things in the economy of church government regulating the degrees of subordination and the methods of administration, it was the province of the bishop to designate the place for the priest to exercise his functions and to prescribe under certain limitations the rules for his guidance and control."

We are of opinion that there was no such contract relation between these parties as will sustain this action. This renders any further discussion of the case unnecessary.

The judgment is reversed.