## Irvine, Appellant, *v.* Elliott.

*Church law— Trial in church court—Reveiw—Conspiracy.*

The civil courts will not review the proceedings of ecclesiastical courts on matters which come within the jurisdiction of the latter.

A priest of the Protestant Episcopal Church cannot hold the bishop of his diocese and a member of his congregation liable in damages in an action of trespass for an alleged wilful and malicious conspiracy, where the evidence shows that the defendants combined to make charges against the priest of conduct unbecoming a clergyman, and supported these charges with evidence in a trial in an ecclesiastical court, which resulted in the degradation of the priest from the ministry; and this is the case although the acts of the defendants may have to some extent been influenced by vindictiveness and hatred.

Argued April 21, 1903.   Appeal, No. 20, Jan. T., 1903, by plaintiff, from judgment of C. P. Huntingdon Co., Sept. T., 1900, No. 17, on verdict for defendant in case of I. N. W. Irvine v. Emma D. Elliott, Ethelbert Talbot and Alexander Elliott.   Before DEAN, FELL, BROWN, MESTREZAT and POTTER, JJ.   Affirmed.

Trespass for alleged wilful and malicious conspiracy.
The facts are stated in the opinion of the Supreme Court.

*Errors assigned* were various portions of the charge and rulings on evidence.

*Henry Budd* and *Harry W. Petrikin* and *William H. Woods* for appellant.

*C. M. Clement* and *H. A. Fuller,* with them *H. H. Waite* and *R. A. Oribson,* for appellee.

PER CURIAM, May 11, 1903:

This appellant and plaintiff in the court below, I. N. W. Irvine, was a priest of the Protestant Episcopal Church and in April of 1898 was in charge of St. John's parish of Huntingdon, Pennsylvania.   This was a very old established church of the Episcopal denomination, but at the date mentioned had become somewhat weak numerically and financially, consequently, un-

der the church rules, appellant was sent there first as a missionary but a year afterwards he resigned as missionary and thereupon the vestry elected him rector, relinquishing further aid as a mission church. Whatever may have been his exact status under the ecclesiastical law, his real relation afterwards, and down to shortly before the institution of this suit, was that of rector for the parish of St. John. The defendant, Emma D. Elliott, was a member of that congregation, her husband was not a member and had no church connection with the parish; Ethelbert Talbot was bishop of the diocese of central Pennsylvania in which St. John's parish was situated and by the canons of the church had supervision and control of the religious affairs of the diocese and was the ecclesiastical superior of Irvine; at the end of proper proceedings under the canon law, he had power to discipline, remove, or even excommunicate the rector. From the date of Irvine's installation as rector there arose between him and Mrs. Elliott much hostility which was the subject of considerable correspondence between them and Bishop Talbot; there were charges of violation of church law made by Irvine against Mrs. Elliott and charges by her of immorality and forgery against him; there was a criminal prosecution against Irvine for forgery in connection with the matter which was heard in the criminal court and the indictment on his motion quashed on a technical objection. It is very clear, whether Irvine was right or wrong, that the bishop sided with Mrs. Elliott in these accusations. Finally, the trouble culminated in an ecclesiastical court for the trial of Irvine held January 25, 1900, which after a full hearing rendered judgment that Irvine had been guilty of conduct unbecoming a clergyman and that he should be degraded and debarred from the ministry and Bishop Talbot imposed sentence accordingly. Irvine then brought trespass against the Elliotts and the bishop for a wilful and malicious conspiracy to injure him by depriving him of his reputation and the right to exercise his calling in the ministry. There was a long and careful trial in the court below; the learned judge with the utmost patience heard all the testimony which by very liberal rulings had any bearing on the issue. At the close, being of the opinion, there was no evidence to sustain the claim of plaintiff, he peremptorily instructed the jury to find a verdict for defendant.

Plaintiff brings this appeal assigning many errors but there are in substance only two:

1. That defendants conspired to have plaintiff unlawfully deposed from the ministry.

2. That they conspired by unlawful means, to injure his reputation and standing as a Christian minister.

In the large mass of testimony adduced the court could find nothing to sustain either charge, nor can we. Undoubtedly defendants combined to prefer charges against Irvine in the church court and acted in concert to support the charges by what they and the court considered evidence. This was not unlawful, although their action was tinctured with vindictiveness in some particulars. They wanted him deposed from the ministry because they professed to believe him unfit for the office, and they sustained their belief by proof which convinced the court. That they also hated him and by their course possibly gratified less worthy motives than those which prompt a true Christian to action is of no moment, except in so far as it might have affected their credibility as witnesses before the court which tried him.

There is no law which imposes upon a common pleas jury the duty of passing upon the competency or impartiality of a church court. That court believed the evidence against Irvine; therefore, their judgment, even if not approved by Irvine and his friends, and even though not impartial, is not unlawful. He had full notice of the charges, appeared and was heard; the proceedings were lawful and pronounced so by a lawful court. This court, as we have said time and again, is not a court of review of the proceedings of ecclesiastical courts. As remarked in German Reformed Church v. Seibert, 3 Pa. 282, " Civil courts, if they would be so unwise as to attempt to supervise the judgments of church courts, on matters which come within their jurisdiction, would only involve themselves in a sea of uncertainty and doubt which do anything but improve either religion or good morals." Also see McGinnis v. Watson, 41 Pa. 9, Stack v. O'Hara, 98 Pa. 213, and Tuigg v. Sheehan, 101 Pa. 363.

Nor can we see any evidence, that defendants conspired by unlawful means to injure the rector in his reputation and standing. They preferred grave charges, supported by evi-

dence tending to establish them. There is nothing to show they manufactured evidence, committed perjury or suppressed the truth, to bring about a false judgment. It is conceded that the members of the court were men of integrity, could not have been corrupted. They may have been too credulous may have been mistaken as appellant argues. If so we can do nothing to aid him.

All the assignments of error are overruled and the judgment is affirmed.