# Vitagraph Company of America, Appellant, *v.* Swaab.

*Replevin—Act of April 19, 1901, P. L. 88—Issue—Leases of personal property—Moving picture films—Wrongful seizure by lessor —Alleged conspiracy against defendant—Insufficient proof—Color of right in plaintiff—Prematurity of suit—Verdict for defendant— Measure of damages—Exemplary damages—Nominal damages.*

1. An issue is a disputed point, and the replevin Act of April 19, 1901, P. L. 88, intends that only the disputed averments of fact in the declaration and affidavit of defense shall make the issues to be passed on by the jury.

2. Exemplary damages will be allowed in an action of replevin only in a rare case of misconduct, and when the evidence fails to show such misconduct the court should not permit exemplary damages. Such misconduct consists in the obvious perverting of the writ to the purpose of a wilful injury, with a full consciousness in the plaintiff that he has no claim, or in the taking out of the writ and claiming and detaining the property through malice or for the purpose of wanton vexation, or in special circumstances at the time of the service of the writ.

3. As a general principle, where a plaintiff has a legal right to a

particular remedy it matters not what motives may induce him to assert it.

4. In an action of replevin to recover possession of motion picture films, the plaintiff filed a bond and obtained possession of the goods. It appeared from the pleadings and evidence that plaintiff was the owner of the films and had leased them to defendant upon terms which provided that the lease might be terminated by the lessor upon notice to the lessee under certain circumstances; that the right of possession of the leased films should thereupon revert to the lessor "twenty days after notice of such termination" and after the lease had been rightfully terminated, but before the expiration of the twenty days, plaintiff replevied the goods. Defendant contended that the writ had been sued out by plaintiff in pursuance of a conspiracy in restraint of trade entered into by plaintiff and certain other manufacturers of films for the purpose of driving defendant out of business, but there was no proof of any special combination to work against defendant or his interests. The jury found a verdict for defendant for the value of the goods and awarded damages for detention and exemplary damages. *Held,* that the evidence did not support the allegations of conspiracy; that as the title to the films was in plaintiff, the writ had not been issued without color of right; that as defendant had the right of possession in the films at the time of their seizure under the writ, but no right to sublease them, his right was only of nominal value; and the record was remitted with directions to enter judgment for defendant for nominal damages only and costs.

Argued Jan. 19, 1915. Appeal, No. 297, Jan. T., 1914, by plaintiff, from judgment of C. P. No. 2, Philadelphia Co., Dec. T., 1910, No. 3665, on verdict for defendant, in case of Vitagraph Company of America v. Lewis M. Swaab. Before MESTREZAT, POTTER, STEWART, MOSCHZISKER and FRAZER, JJ. Modified and affirmed in part.

Replevin for motion picture films. Before BARRATT, J.

The opinion of the Supreme Court states the facts.

The plaintiff filed a bond and obtained possession of the goods.

Verdict for defendant for the value of the goods,

$2,000; damages for detention, $8,424; exemplary damages, $10,000 and judgment thereon. Plaintiff appealed.

*Errors assigned* were rulings on evidence, the refusal of the court to direct a verdict for plaintiff, the refusal of the court to enter judgment for plaintiff n. o. v., answers to points and instructions to the jury.

*Alex. Simpson, Jr.,* with him *Joseph L. McAleer,* for appellant.

*James Gay Gordon,* with him *Alfred Aarons* and *Henry N. Wessel,* for appellee.

OPINION BY MR. JUSTICE MOSCHZISKER, March 15, 1915:

The Vitagraph Company of America, a New York corporation, instituted this action in replevin, and the jury rendered a verdict for the defendant as follows: "Value of goods, $2,000; damages for detention, $8,424; exemplary damages, $10,000." Judgment was entered upon the verdict and the plaintiff has appealed.

The Act of April 19, 1901, P. L. 88, provides the form of pleadings in replevin, and Section 6 stipulates that "the declaration and affidavit of defense as originally filed, or as amended by leave of court, shall constitute the issues under which, without other pleadings, the question of title to, or right of possession of, the goods and chattels as between all the parties shall be determined by a jury."

The plaintiff claimed 27 moving picture films and averred, in its original declaration, that a corporation known as the Motion Picture Patents Company was the owner of certain patents relating to the manufacture of such films; that the Patents Company did not sell, manufacture, or use the films, but licensed others, including the plaintiff, to manufacture and lease, but not to sell, them to other concerns known as exchanges, which were

likewise licensed by that company to sublet these patented films to exhibitors who had secured a license from it to exhibit motion pictures; that the defendant was duly licensed as an exchange on January 20, 1909, and had entered into a license agreement in writing, which was attached as an exhibit; that the 27 replevied films were the property of, and had been manufactured by, the plaintiff; that they had been delivered to the defendant upon the terms and conditions of his license agreement; that this agreement provided the ownership of each film should remain in the licensed manufacturer and that whenever the agreement was terminated the right to the possession of the film should revert to the manufacturer "twenty days after notice of such termination," a copy of which agreement was attached as an exhibit; that each of the films claimed had thereon the plaintiff's trademark (a spread eagle) and was delivered in a box to which was attached a printed label stipulating, inter alia, "The lessee shall not have the right to sublet such motion picture until such lessee has entered into an agreement in writing with the Motion Picture Patents Company containing terms and conditions......and only while such lessee complies with such terms and conditions and while such agreement remains in full force and effect," a copy of the label being attached as an exhibit; that each shipment of the replevied films was accompanied by a bill which stipulated that the films were leased and not sold and that they were subject to the conditions of the license granted by the Motion Picture Patents Company and to the conditions expressed on the box label, a copy of this bill being attached as an exhibit; that the defendant's license was "cancelled in accordance with the terms of the said exchange license agreement" and the defendant notified to that effect on January 3, 1911; on the foregoing averments of fact, it was claimed that "twenty days thereafter the right to possession of all the licensed motion pictures delivered to the defendant

by the plaintiff, under said exchange license agreement, reverted to the manufacturer......, the plaintiff in this action."

The defendant's original affidavit of defense, after first calling attention to alleged defects in the statement of claim, and entering certain defenses which were not pressed at trial, averred that the plaintiff was not entitled to maintain any action based on the defendant's license agreement because the plaintiff, together with the Motion Picture Patents Company, seven other ·corporations and two individuals (all except the Patents Company being licensed exchanges) form a combination "in restraint of trade and in violation of the laws of the State of Pennsylvania and of the acts of congress" relating to monopolies; that the notice of the termination of his license was not given to him on January 3, 1911, as averred in the declaration, but on January 4, 1911. None of the material averments of fact as to the ownership of the films, the terms of the contracts, or concerning the cancellation of the defendant's license, is specifically denied in this affidavit of defense, but it ends with a mere general denial that amounts to no more than a statement of the defendant's conclusion that he had not "at any time or in any manner violated the terms and conditions of any agreement between him and the Motion Picture Patents Company"; after which the defendant, without controverting the plaintiff's ownership of the films, denied that the plaintiff "at the time of the issuance of the writ in this case had any right of possession in and to the films taken," and asserted that the notice of the cancellation of his license was "unfounded, malicious and false and resulted from a conspiracy between the plaintiff and the Motion Picture Patents Company and others to ruin and oppress the defendant and to destroy his trade and business."

After the defendant's affidavit had been filed, the plaintiff, by leave of court, filed an amended declaration in which it reiterated the averments concerning its

ownership of the property and the cancellation of the defendant's license by the Motion Picture Patents Company, adding that after such cancellation and notice thereof to the defendant, he, "contrary to the terms and conditions of said labels and invoices and contrary to the terms and conditions of his said exchange license agreement, did sublet motion pictures......including the films above referred to (the 27 replevied films) or some of them, from time to time, to persons or corporations not licensed by the Motion Picture Patents Company," naming persons to whom the defendant had let the films after the cancellation of his license, but not designating when or to whom any one of the 27 films in question had been delivered. The amended statement also contains an averment that the defendant, contrary to the terms of his license and of the label and invoices, had permitted films leased to him by the plaintiff to be exhibited in unlicensed theaters or places of exhibition with unlicensed motion pictures, particularly stating a number of instances, with names and places, where this had occurred. The amended statement ends with the averment that "by reason of the facts aforesaid, the plaintiff, prior to the commencement of this suit, became entitled to immediate possession" of the replevied films.

The defendant filed an amended affidavit of defense in which he increased his claim of damages and alleged that the writ had been sued out "without color of right," and that the taking of the films under the replevin was "attended by circumstances of hardship, vexation and outrage......all of which was part of a scheme to deprive the defendant of his lawful livelihood and to remove him from the field of competition......and was an unlawful and malicious abuse of the process of law."

It is to be noticed that the supplemental affidavit of defense does not contain any denial of the material facts averred as justifying the Motion Picture Patents Company's cancellation of the defendant's license, or of the

facts depended upon by the plaintiff to substantiate its claim of ownership in the replevied films. Hence, since the statute intends that the averments of the declaration and affidavit of defense (meaning, of course, the averments of fact: Miller v. Jackson, 34 Pa. Superior Ct. 31, 37) shall make the issues to be passed upon by the jury, and, since an issue is a disputed point, it is apparent that the only material issues which were properly in dispute at the time of trial concerned the questions of the right of possession to the films, the value of such right, and the defendant's claim for exemplary damages. In other words, there was no issue raised as to the ownership of the property, for, by the pleadings, that was impliedly conceded to be in the plaintiff, and, under the circumstances, it could not properly be contended that the writ was without color of right.

Not only the pleadings, but the proofs at trial showed the plaintiff's title, and hence its color of right to the writ, for we find on the record either copies of the actual invoices introduced by the defendant or evidence indicating that such documents were produced and identified, which show that he received from the Vitagraph Company certain of the 27 films in controversy. In addition, there was testimony that the films were shipped to the defendant by the plaintiff company, each in a tin box with the license label thereon. Furthermore, when called under cross-examination, the defendant admitted that he had received from the plaintiff a large number of the films, all between April 13, 1909, and July 5, 1910, and that they were accompanied by the plaintiff's bills and invoices. Thus, aside from the pleadings, the evidence was amply sufficient to prove that most of the films in controversy (all but two) were actually shipped by the plaintiff and received by the defendant. Morevover, there was testimony to show that the bills accompanying these films contained the following, "The films covered by this invoice are leased and not sold; subject to the conditions of a license issued to lessee by the

Motion Picture Patents Company......and to the conditions expressed on the labels of the boxes in which these films are shipped"; that the license above referred to contained this condition, "The ownership of each licensed motion picture leased under this agreement shall remain in the licensed manufacturer and importer from whom it may have been leased"; and that the labels had this stipulation printed thereon, "The lessee...... shall have only the right to sublet or use such motion picture." The documentary proofs put in evidence by the defendant showed that he was notified by the Motion Picture Patents Company at the time of its incorporation that "hereafter licensed motion pictures will not be sold outright, but will be leased by the various licensed manufacturers and importers, so that the latter may at all times retain title"; and the defendant testified that after January 20, 1909, when he entered into his agreement with the plaintiff company, "I received the films from them, paid their bills and used the films only for rental purposes......under that contract or lease I had the right to use the films I purchased for seven months......then I was to return to the Vitagraph Company 80 per cent. of the films I had purchased seven months prior, but I was not confined to Vitagraph films, I could send any positive film"; so it may be seen that the documentary evidence and testimony of the defendant showed not only that he had received the films from the plaintiff, but the ownership of the latter.

Notwithstanding the apparent ownership of the plaintiff, as impliedly conceded in the pleadings and shown by the evidence, the defendant contended at trial that the 27 replevied films belonged to him; he said that in 1909, at the time of his license contract, he had on hand about 1,000 films, purchased outright and belonging absolutely to him; that the arrangement was, at first, that he should at the end of each month return all the films received during the seventh month prior; that the Patents Company, in February, 1910, changed this to

80 per cent. and permitted "any age and make" of film which a lessee had on hand to be returned; that acting under and by virtue of this extended privilege he had used his own films in making returns, and had "returned all the films called for by the various manufacturers"; therefore, he contended that the particular films on hand at the time of the replevin belonged to him absolutely, and were not the property of the plaintiff. No such issue was raised by the pleadings, but waiving that point for the moment, it appears that the defendant was receiving films from other licensed manufacturers in addition to those secured from the plaintiff company, and we find no testimony that he in fact returned any of his own films to the plaintiff, the nearest approach to this being an assertion to the effect that "some of them (his own films) undoubtedly were returned to the Vitagraph Company for films I had received from them seven months prior." This assertion was a mere expression of opinion and cannot be accepted as evidence of a fact. On such a state of proof, in the face of the documentary evidence showing the ownership of the plaintiff, the evidence relied upon was entirely insufficient to prove a transfer of title to the defendant. Whether, should he prove that certain of his own films were delivered to the plaintiff company, the defendant could, in a proper action, recover such films or recompense therefor, is a point not necessary now to determine; but it is quite clear that there was no testimony to sustain a finding that any of the replevied goods belonged to the defendant. The uncontested averments of the plaintiff's declaration, and the very evidence produced or relied upon by the defendant, showed that the films had been manufactured by the former and leased by it to the latter, and there is nothing to justify or sustain a finding that they belonged to the defendant, or that the writ was issued without color of right.

Before taking up the question of the right of possession to the replevied films at the time the suit was

brought, we shall first consider the subject of exemplary damages. Even though the plaintiff showed title to the films, nevertheless, the defendant was entitled to a verdict, for, under the terms of the license agreement, the replevin issued prematurely, and the plaintiff did not sufficiently aver or prove a breach of the label contract by showing a letting of any particular film covered by the writ after the termination of the defendant's license; upon these points see Lubin Mfg. Co. v. Swaab, 240 Pa. 182. While the defendant alleged, in his affidavits of defense, a general, unlawful combination in restraint of trade, and that the notice from the Patents Company canceling his license was issued with a wicked intention to harm him, yet, when the case came to trial, he stated he did not claim that the Patents Company and its system of issuing licenses "was in the nature of an illegal combination." He did contend, however, that the Patents Company, with the ten licensed manufacturers, had entered into a combination with another concern known as the General Film Company, likewise a licensed manufacturer, to drive him out of business, and that the writ of replevin was the climax of this conspiracy. The General Film Company was incorporated April 18, 1910, most of the incorporators being officers of the other ten licensed manufacturers and one of them the treasurer of the Vitagraph Company. A member of the board of the General Film Company was also a director of the Vitagraph Company; but, the defendant's witness testified that all the incorporators of the General Film Company acted individually—for their own respective interests—and not as representatives of any other concern. The General Film Company is not referred to in either the affidavit or supplemental affidavit of defense as a member of the alleged conspiracy against the defendant; but evidence was offered to show that this concern had entered into negotiations with the latter, in the summer of 1910, for the purpose of purchasing his business, that a price was agreed upon, that subsequent-

ly the defendant became dissatisfied with the arrangement and the company then called the whole transaction off by a letter, to which the defendant replied, "I have no criticism to make and accept with good grace your ultimatum." The defendant now contends, however, that this negotiation was not in good faith—that it was part of the conspiracy against him; but we have read every line of the testimony offered at the trial, together with all the documentary evidence, and feel there is absolutely nothing therein to justify an inference that the effort to buy the defendant out was commenced or carried on in other than good faith.

From the evidence produced, we do not see how, justifiably, either the General Film Company or the plaintiff could be found to have been a member of a conspiracy such as the defendant alleges existed against him. The arrangement under which he was working appears to have been entered into with his eyes open and with a full knowledge of its terms; so he must have known that his license could be revoked at any time by the plaintiff company, either with or without a cause. He admitted that he was one of four film exchanges in Philadelphia that went into this licensing arrangement, when other dealers, although offered a license, refused to do so, and that competitors are "in existence to-day notwithstanding that they could not get that license"; but, as before stated, when it came to trial the defendant did not depend upon his averments of a general conspiracy in restraint of trade, but alleged a special conspiracy against him, to prove which he called a witness who showed that a meeting was held in New York, in December, 1910, that was attended by a representative of the Patents Company and by representatives of most of the ten licensed manufacturers; that this was a gathering which took place every year at about the same time; that at this particular meeting the licensed manufacturers approved a determination that had previously been reached by the Patents Company to cancel the defendant's li-

cense; that before canceling licenses of film exchanges it was usual in all cases to secure a vote of confirmation from the licensed manufacturers, because they were vitally interested in keeping as many exchanges in existence as possible; that they did not cancel such licenses except on complaint and after investigation had shown to their satisfaction violations by the exchange of the terms of its license agreement; and that on the occasion in question a general discussion concerning the conduct of the defendant's exchange took place before the Patents Company's decision to cancel his license was approved. There was no proof as to who attended the meeting on behalf of the plaintiff company, or whether the representative of that company voted for or against the cancellation of the license, nor was any prior corporate action by the plaintiff company upon this subject shown; and, finally, it appeared that everything done at the meeting, in connection with the cancellation of the defendant's license, was in accord with the general custom adhered to in dealing with such matters. The witness who gave this testimony, although called by the defendant, stated he was the president of the General Film Company, but that he had no connection with the plaintiff company, and this witness, in stating the purposes for which the Patents Company and the General Film Company were formed, if his testimony were accepted, showed them to have been incorporated for proper purposes and to have been conducted without a thought of injuring any one; in fact, from this testimony and the documentary proofs relied upon by the defendant, the whole licensing scheme seems to have been an arrangement to protect the use and to prevent the abuse of the patents possessed by the Patents Company and used by its licensees, for the mutual benefit of all concerned.

Whatever the real fact of the matter may be, the defendant failed to prove any special combination to work against him or his interests—the only combination

shown being the general one existing between the Patents Company and all the licensed manufacturers—and he likewise failed to show that in the working of this general combination anything unusual occurred in connection with his case. The license combination, or connection between the Patents Company and its lessees and sub-lessees, was conceded to exist by all parties, but the defendant and all his licensed customers were to a degree a part of that general combination as well as the plaintiff company, and, as we have already stated, no evidence sufficient to show a special combination with an evil purpose toward the defendant was presented. Whenever such a conspirary is claimed to exist it must be proved by "full, clear and satisfactory evidence," and, in each case, it is for the court to say whether evidence sufficient, if believed, has been presented to meet this burden: Ballantine v. Cummings, 220 Pa. 621. Under the evidence at bar, it must be held that the proofs depended upon were entirely insufficient to show such a conspiracy as here alleged; therefore, there is nothing to sustain the finding of exemplary damages unless it could be found that the taking of the goods was attended by undue aggravation, vexation and hardship. As to this, an examination of the evidence shows no such circumstances. The conditions at the time of the levy were as stated in Lubin Mfg. Co. v. Swaab, supra, and we need only repeat what is there said (p. 192) : "In the nature of things, when the sheriff's officers came to the defendant's place of business the proceeding was bound to cause him inconvenience," but he is not entitled to damages on that score.

The questions we now have to determine are: Did the plaintiff prove a present right of possession to the replevied films, and, if not, what was the value of the possession to the defendant. The license contract contains several provisions concerning its termination, one of them stipulating that it might be terminated by the licensor at any time upon fourteen days' notice; but

the particular provision here involved (since the defendant's license was revoked thereunder) is this: "It is further agreed by the licensee that if this agreement is terminated by the licensor for any breach of any condition hereof, the right to possession of all licensed motion pictures shall revert, twenty days after notice of such termination, to the respective licensed manufacturers and importers from whom they were obtained and shall be returned to such licensed manufacturers and importers at once after the expiration of that period." As already stated, the replevin issued one day before the time set in the above quoted provision had expired; this being so, a then present right of possession was not in the plaintiff, but in the defendant. The question remains, however,—What was the value to the defendant of this right of possession? In determining this point we must again refer to the defendant's license agreement and the label contract, for by the latter the appropriate terms of the former were read into the letting of every film to the defendant. The label contract particularly stipulates that the defendant shall have only the right to sublet the film to which it is attached "while such agreement remains in full force and effect," and the license agreement provides that, immediately upon the expiration of twenty days after notice of its cancellation, all films rented by the defendant shall be returned to the respective manufacturers. Of course, the defendant could physically hold possession of the films which he had on hand, even after the expiration of the twenty days, but he had no right to use or sublet them, for it was his duty to return them to the manufacturer from whom they had come. In other words, he could not make any use of the licensed films twenty days after the termination of his license agreement unless he breached his contract duty to return them at that time, and that he would commit such a breach we cannot assume as a possibility in determining the value of his right of possession; all of which brings us to the con-

clusion that this right of possession in the replevied films had but a nominal value.

We are conscious of the fact that in the like case of Lubin Mfg. Co. v. Swaab, supra, we said (p. 191), "Owing to the position in which the defendant is placed by the terms of the license contract under which he operated his business, the damages which it is possible for him to recover may be inconsiderable, but we cannot say as a matter of law that they would be merely nominal," but more mature study and consideration have brought the conviction that we erred in determining that the defendant's possession had more than a nominal value, and since the present writer was the author of that opinion, he does not hesitate so to state at this first opportunity.

Most of the cases cited by the appellee were presented on the theory that the evidence was sufficient to sustain the findings of fact necessary to support the verdict of the jury as to the ownership of the films and the damages awarded; but, since we have determined the evidence to be insufficient in those respects, an extended review of the authorities becomes unnecessary; we have examined all of them, however, and find nothing in conflict with the views expressed in this opinion. M'Donald v. Scaife, 11 Pa. 381; Schofield v. Ferrers, 46 Pa. 438; Herdic v. Young, 55 Pa. 176; Rafferty v. Haldron, 81* Pa. 438; Craig v. Kline, 65 Pa. 399; Dennis v. Barber, 6 S. & R. 420, and Wiley v. McGrath, 194 Pa. 498, are all instances of verdicts for plaintiffs where the evidence showed that the actual taking was attended by circumstances of "outrage and oppression" comprising "vindictiveness, wantonness, fraud, deceit or real violence," or that the detention was accompanied by "vexation and oppression." In Cummings v. Gann, 52 Pa. 484, 491, we said that it must be "a rare case of misconduct" when exemplary damages are allowed in an action of replevin, and in Carey v. Bright, 58 Pa. 70, 85, we said that where the evidence failed to show such misconduct the court should not permit exemplary damages. M'Cabe v. More-

head, 1 W. & S. 513, 516, is an instance where judgment on a verdict for the defendant which included exemplary damages was reversed because an "examination of the evidence" showed nothing "in the conduct of the plaintiff in taking out the replevin and claiming and detaining the property manifesting malice or wanton vexation," and we there cite Cable Fitch & Losee v. Dakin & Dakin, 20 Wendell 171, and Brizsee & Torrence v. Maybee, 21 Wendell 144, two cases where the verdicts were for the defendants, in the latter of which the rule is laid down that exemplary damages cannot be allowed unless the evidence shows that the writ had "obviously been perverted to the purpose of a wilful injury with a full consciousness in the plaintiff that he had no claim." Finally, in Cox v. Burdett, 23 Pa. Superior Ct. 346, exemplary damages were struck out in affirming a verdict for the defendant. We have not been referred to any Pennsylvania case, and we know of none, in which exemplary damages were allowed to the defendant where the plaintiff had a color of right to the writ and no special circumstances of hardship at the time of its service appeared. The general principle is that where a plaintiff has a legal right to a particular remedy it matters not what motives may induce him to assert it (Jenkins v. Fowler, 24 Pa. 308, 310; Wilson v. Berg, 88 Pa. 167, 172); but it is not necessary to discuss whether, in view of the plaintiff's ownership of the films, the present defendant could, under any circumstances, recover exemplary damages in replevin, for, as already decided, the evidence relied upon was insufficient for that purpose.

We have written at some length in order to develop plainly the reasons which impelled us to the conclusion that the large monetary awards comprehended in the present verdict could not be sustained; but it is not necessary to pass specifically upon each of the 23 assignments of error, many of which concern mere details of the trial; without adding further to this already too

lengthy opinion, we shall follow the practice pursued in Duroth Mfg. Co. v. Cauffiel, 243 Pa. 24, 33, and enter the following order: The record is returned to the court below with directions to strike out the monetary awards, and to permit the judgment in favor of the defendant to remain for nominal damages and costs; to this extent the judgment is affirmed.