Rosenblum *v.* Rosenblum et al., Appellants, et al.

Argued October 3, 1935. Before FRAZER, C. J., KEP-HART, SCHAFFER, MAXEY, DREW and LINN, JJ.

*Oliver K. Eaton,* with him *C. E. Brockway, Leo H. McKay,* of *Brockway, Whitla & McKay,* and *Nathan Routman,* for appellants.

*Sidney E. Rosenblum,* with him *Robert M. Gilkey, Benjamin Jarrett* and *Clyde W. Osborne,* for appellee.

OPINION BY MR. JUSTICE LINN, November 25, 1935:

Plaintiff sued[1] for damages resulting from alleged conspiracy. He contended that defendants conspired and executed their conspiracy unlawfully to injure him by reducing his income and impairing his credit and capacity to do business. The verdict and judgment were against two of the defendants, H. David Rosenblum and Samuel W. Epstein, now the appellants.

Conspiracy may be proved by direct or by circumstantial evidence. As there was no direct evidence of the agreement, the circumstances were relied on. In

---

[1] The action was brought against H. David Rosenblum, Oscar Ben Rosenblum, Bessie Rosenblum Epstein and Samuel W. Epstein, Lillian Rosenblum and Edith Rosenblum Rosenfeld. After the testimony for the plaintiff was presented, he asked that the action be dismissed against Bessie Rosenblum Epstein, Lillian Rosenblum and Edith Rosenblum Rosenfeld. The case went to the jury against H. David Rosenblum, Oscar Ben Rosenblum and Samuel W. Epstein.

such case, before circumstantial evidence may be submitted to the jury, the court must be satisfied that it is sufficient to prove the agreement and the damage, for without damage the conspiracy is not actionable. The testimony covered transactions and business relations extending over a period of ten or twelve years, during more than half of which the relations of the parties were amicable.

The learned trial judge very frankly states that he was in doubt whether the evidence was sufficient to be submitted to the jury, and that, later, he "had difficulty in reaching a conclusion" that defendants' motion for judgment n. o. v. should be refused. He instructed the jury: "It is therefore for you to determine whether or not there is sufficient evidence to sustain the action of conspiracy against [the three defendants] or against any of them." The instruction was wrong. On this record it was not the duty of the jury to determine whether the evidence was sufficient.

In Ballentine v. Cummings, 220 Pa. 621, 631, 70 A. 546, we said: ". . . and when circumstantial evidence is relied on to prove the conspiracy its sufficiency must first be determined by the court . . . If the testimony is direct and positive as a rule the question of sufficiency cannot arise, and in such cases it is for the jury to pass upon the credibility of witnesses and determine the fact by the weight of the evidence. When the testimony is not direct and positive, but where subsequent acts and circumstances are relied on to establish the conspiracy, a very different situation is presented. In such a case the first duty rests with the court to say whether the proven acts and circumstances, even if believed, are sufficient in law to establish in point of fact that the unlawful combination had been entered into by the parties charged, or two or more of them at some prior date. If the subsequent acts do not show, or tend to show, the prior unlawful combination and purpose, the very foundation of the action, it is clear the plaintiff has failed

to make out his case and it is the duty of the court to say so." See, too, Vitagraph Co. v. Swaab, 248 Pa. 478, 490, 94 A. 126; Com. v. Benz, 318 Pa. 465, 178 A. 390.

It is unnecessary to extend this opinion by describing the various overt acts relied on by the plaintiff scattered throughout the long record. Beginning soon after 1920 plaintiff and defendants, as tenants in common, from time to time bought real estate, the defendants supplying plaintiff with the necessary funds to pay his share, the fractional ownership depending on the number of persons joining in the respective purchases. Some properties so acquired were sold at a profit; occasionally there was loss; some were let to tenants. The defendants (except Epstein who was employed by the firm) were grocers, trading as Nathan Rosenblum & Company; as they held the larger undivided interests in the real estate purchased, and perhaps also because they had the clerical force and equipment necessary, they kept the accounts, paid the taxes, and, in large measure, managed the properties, at least dividing that work with the plaintiff. About 1925, differences arose between the parties resulting from defendants' reluctance to continue joining in the renewal of plaintiff's notes. Later they notified him that they would no longer continue to endorse or guarantee his notes as they had been doing. They proposed an arrangement for the installment reduction of his indebtedness to them over a specified period. He declined to comply with their request, and contended that he and they were partners in these transactions and that they had agreed to carry him as will be more fully stated hereafter. Defendants denied both claims. Apparently the differences increased, for in 1930 they obtained judgments against him on his notes; and further to determine their tenancy in common, one of the defendants brought suits in partition against his co-tenants, of whom the present plaintiff-appellee was one. He then filed petitions to open the judgments against him, and to stay the executions (cf. Long v.

Lebanon Nat. Bank, 211 Pa. 165, 60 A. 556) asserting, inter alia, that he and his co-tenants were partners and that the notes were given on condition that they should be paid only out of the proceeds of the sale of the properties, for which they had been given in payment of his share, and that such sales had not been made. After hearing on evidence his petitions were dismissed. On appeal, the judgment was affirmed: Rosenblum v. Rosenblum, 313 Pa. 49, 169 A. 79.

In the trial of this conspiracy action he was, however, permitted to offer testimony of the same alleged agreement, and that judgments were entered on the notes and executions issued; this evidence was put in to afford a basis for a finding by the jury that defendants had agreed to injure plaintiff, apparently by obtaining judgments against him and issuing executions, and had successfully carried out their plan. The evidence was objected to on the ground that it had been judicially determined in the litigation referred to that the contract alleged did not exist, that the evidence was irrelevant, and that the judgments were valid and the right to issue execution established. The plaintiff contended that those matters had not been adjudicated. We think it was determined in the former action[2] that the alleged contract did not exist (Hochman v. Mortgage Finance Corp., 289 Pa. 260, 137 A. 252) and that the judgments were legal and the right to execution established. The

---

[2] The present plaintiff's counsel, in his brief filed in that appeal, thus stated the first question involved, showing what he thought was presented for the consideration of this court: "1. Should a judgment confessed on an unsealed nonnegotiable note, which note represents the maker's share of the purchase price of a specific property in a common realty enterprise solely financed on the credit of the payee, be opened to receive a defense that an oral agreement was entered into at the execution thereof and subsequently thereto postponing the maturity date of said note until the said property was sold, the proceeds whereof were to provide the primary source of payment?"

plaintiff, judgment debtor in those cases, cannot now complain that the judgments against him were enforced. In Jenkins v. Fowler, 24 Pa. 308, 310, BLACK, J., said: "When a creditor who has a just debt brings a suit or issues execution, though he does it out of pure enmity to the debtor, he is safe . . . In short, any transaction which would be lawful and proper if the parties were friends, cannot be made the foundation of an action merely because they happened to be enemies." In Kirmse v. Adler, 311 Pa. 78, 86, 166 A. 566, we said, "If one has a legal right to do a particular thing, the law will not inquire into his motive for doing it." See, also, Allison's Appeal, 86 Pa. Superior Ct. 451; Long v. Bank, supra; Vetter's Estate, 308 Pa. 447, 453, 162 A. 303.

If, instead of several joint judgment creditors, there had been but one judgment creditor who had issued execution, the judgment debtor could not have successfully complained against him for enforcing the judgment, however much it interfered with his income, credit or capacity to do business. The mere fact that the suits were brought and executions issued by joint plaintiffs instead of but one, makes no difference in that respect.[3] See Miller v. Post Publishing Co., 266 Pa. 533, 110 A. 265; Irvine v. Elliott, 206 Pa. 152, 55 A. 859; Kirkpatrick v. Lex, 49 Pa. 122. It is true that two or more persons may have the legal right separately to do certain acts, which, intending to injure another rather than benefit themselves, they may not do in combination to the detriment of another. The test is stated by BOWEN, L. J., in Mogul Steamship Co. v. McGregor, Gow & Co., 23 Q. B. Div. 598, 618 (affirmed, 1892 A. C. 25), as follows: "Assume that what is done is intentional, and that

---

[3] "Generally speaking, the liability depends not on the coöperation or conspiring, but on the character of the acts done, supposing them all to be done by one man, or irrespective of the question whether they were done by one or several." Holmes: The Common Law, 143.

it is calculated to do harm to others. Then comes the question, Was it done with or without 'just cause or excuse'? If it was bona fide done in the use of a man's own property . . . such legal justification would . . . exist not the less because what was done might seem to others to be selfish or unreasonable . . . But such legal justification would not exist when the act was merely done with the intention of causing temporal harm, without reference to one's own lawful gain, or the lawful enjoyment of one's own rights."[4] There is an obvious distinction where, as in this case, the result accomplished, though consummated by means of combination, is one which the party claiming to have been injured must have contemplated as a possible result of his contract. Motive in such case is immaterial. Cf. Adler v. Fenton, 65 U. S. 407. To succeed in his suit it was necessary that plaintiff show that defendants had acted unlawfully, that there was no legal justification or excuse for what they did. The judgments and the executions were lawful, as was held in the former appeal, supra, and furnished no ground for the inference of conspiracy. The plaintiff made the defendants joint payees or joint obligees and thereby agreed that they should act jointly to enforce his obligations in case of default. He furnished the justification or legal excuse for defendants' joint conduct.

In his brief he deals with other evidence offered to support his contention, but we can find no evidence of unlawful conduct. A few matters, illustrative of the general character, may be referred to. He complained of the expense in putting a new front on one of the business properties and questioned the amount expended for the purpose as well as the propriety of the expenditure. The record shows a basis of possible differences of busi-

---

[4] See also Pollock, The Law of Torts, 13th ed., 337; Holmes: Privilege, Malice and Intent, 8 Harv. L. R. 1, Collected Legal Papers, 117; Sorrell v. Smith, [1925] A. C. 700.

ness judgment on the subject but there is no evidence of unlawful conduct. This is true, too, of the complaints that in some cases the rent was reduced, and that his recommendations were at times disregarded. If his income was diminished by the expenditure, or the reduction of rent, that of his four co-tenants suffered in the same way. If the majority of the co-tenants thought the expenditure necessary to retain the tenant for another term, appellee, so far as appears in this record, cannot complain. He always had his rights as tenant in common, and could at any time have exercised them. A witness also testified that after the new front had been put into the building one of the defendants said to the witness: "That's a nice front you got in the Union Store." "We will have new fronts in all of those store fronts, and we will soon own that building." These statements, it is contended, indicated an agreement and action pursuant to it. They seem to have been made in the Fall of 1930, but whether before or after the judgments were entered and the partition suits begun is not clear. But, in any view, they cannot be regarded as "full, clear and satisfactory" evidence that anything unlawful was in contemplation. All the evidence of this character may be laid aside under the rule thus stated in Benford v. Sanner, 40 Pa. 9, 17, by STRONG, J.: "The humane presumption of the law is against guilt, and though a conspiracy must ordinarily be proved by circumstantial evidence, yet it is not to be forgotten that the charge of conspiracy is easily made, and that in a race between creditors suspicions of unfairness are readily awakened. Mere suspicion, possibility of guilty connection, is not to be received as proof in such a case, and especially in such a case, because, when the connection is proved, the acts and declarations of others become evidence against the party accused." See, too, Com. v. Benz, supra. The statements complained of may have referred to the partition suits (in which partition was ordered) and declarant's expectation that he

and his co-tenants would become, or, to protect their own investment, might have to become purchasers of plaintiff's interests in the sales in those suits, or at the sales on the judgments obtained on the notes. If plaintiff's financial condition was as he described it, he could hardly have hoped to become a buyer. As the statement is consistent with innocence it does not help the plaintiff: Ballentine v. Cummings, supra. The same is true of other declarations referred to in the record. A point was also made that there were mistakes in the bookkeeping, which was done by either or both of two bookkeepers employed by the grocery firm. The tenant of the hotel paid his rent to Nathan Rosenblum & Company; he also purchased groceries from that firm; sometimes payments were made on one account or the other and not in the first instance credited to the proper account. Some of the payments were by check and some by note. We think that all the rent received was duly credited and properly accounted for. And the evidence shows that the bookkeeping mistakes were corrected in the course of business as soon as they were discovered, apparently before the appellee knew of them; he appears to have learned of them from statements of account rendered to him by his co-tenants; if they had wished to cheat him, they would hardly have advised him. He sustained no loss of income or damage to his credit on that account. These and similar matters not recited are frivolous as ground to support the serious charge made against the defendants. No purpose would be served by here dealing with all of them in detail. We have considered them singly and together and find nothing to support the verdict.

The judgment is reversed and is here entered for the defendants.