Commonwealth *v.* Bardolph, Appellant, et al.

Argued March 24, 1937. Before KEPHART, C. J., SCHAFFER, MAXEY, DREW, LINN, STERN and BARNES, JJ.

*Charles B. Prichard,* for appellant.

*Earl T. Adair,* with him *Andrew T. Park,* for appellee.

OPINION BY MR. JUSTICE MAXEY, June 25, 1937:

Bardolph, the appellant, and his co-defendant in the court below, Friedman, were convicted under Section 128 of the Criminal Code of March 31, 1860, P. L. 382 (18 P.S. sec. 2451) of conspiracy to cheat and defraud the Franklin Savings & Trust Company, of Pittsburgh, and they were sentenced to imprisonment of from one to two years. Defendants appealed unsuccessfully to the Superior Court: 123 Pa. Superior Ct. 34, 186 A. 421. Leave to appeal to this court was thereupon granted. Since perfecting this appeal, Friedman died; his appeal has been abated; only the appeal of Bardolph remains for determination.

The evidence of conspiracy was circumstantial. The Commonwealth sought to show inferentially from certain banking transactions in which both defendants were involved that a conspiracy existed between them.

Appellant contends that the evidence did not amount to legal proof of conspiracy and that a verdict of acquittal should have been directed. The Commonwealth's case rested on the testimony of officials of the bank and others who dealt with it, and on the results of an audit of its affairs conducted by the Department of Banking after the bank failed and was taken over by the State authorities.

In 1928 appellant was treasurer of the Franklin Savings & Trust Company, J. M. Stoner, Jr., being president. Friedman was a mortgage broker who carried on his financial dealings through the bank, dealing only with Stoner. On July 26, 1928, the trust company made a loan to Friedman of $60,000, taking his note in that

amount and as collateral a mortgage he owned for $80,000 and given by Louis Hendel as mortgagor. It was admitted at the trial that the books of the trust company do not reflect the transaction with strict accuracy. The mortgage register shows a debt of $80,000 and a credit of $20,000 in favor of Friedman. The mortgage was, moreover, made direct to the trust company, *instead* of being first in Friedman's name as mortgagee and by assignment in the name of the trust company as pledgee. Nevertheless, it was the understanding of all parties that Friedman owned the mortgage and had a $20,000 equity in it over and above the debt due the bank. This transaction was handled by Stoner, its president.

Appellant succeeded Stoner as president in January, 1929. Meanwhile payments of $2,000 a month had been made to the trust company by the mortgagor, as required by the mortgage. Ten such payments were made, the last on May 29, 1929, reducing the amount due thereon to $60,000, making Friedman's equity therein still $20,000. The Commonwealth conceded that up to this point appellant had nothing to do with the transaction, and hence the alleged conspiracy, if it came into being, had its birth subsequent to May, 1929. Thereafter no further payments were made on the mortgage and it became in default.

On July 11, 1929, the bank discounted another note of Friedman's for $50,000. The collateral securing it included other mortgages of $50,000 face value and the additional equity of $20,000 in the Hendel mortgage owned by Friedman. The validity of this transaction is not impugned, and it was not shown that appellant had anything to do with its negotiation.

About this time, or a little later in the summer of 1929, negotiations were opened between Friedman and The Pennsylvania Surety Corporation for the purchase by the latter of the Hendel mortgage still held by the trust company as collateral security. It appeared that

the surety company had assumed obligations on Hendel's behalf without full disclosure by him of the fact that the mortgage, which was blanket in form, had been given to Friedman. The surety company, to protect its own interests, determined, first, to take steps to avoid its foreclosure and ultimately to buy it in. It knew that the mortgage was held by the trust company as collateral and would not be assigned until Friedman's debt had been paid. Nevertheless it had complete confidence in Friedman and all its negotiations were with him and none were with the trust company. There was no lack whatever of full disclosure by Friedman. The president of the surety company testified it had no contact with the trust company because it relied implicitly on Friedman both for the extension of the mortgage and the ultimate assignment.

The first step was an oral agreement between Friedman and the surety company, in August, 1929, that payment of the mortgage would not be demanded until September. For this the surety company paid Friedman $5,000. On September 5, 1929, a written agreement was signed between these parties. This recites the fact that the mortgage then stood in the name of the trust company, that a balance of $60,000 remained due on it, that it was in default, and that $5,000 had previously been paid to Friedman for an extension. The parties then agreed to a further extension to October 2, 1929, for an additional consideration of $5,000, and Friedman agreed to procure assignment of the mortgage to the surety company at any time prior to that date, for the sum of $50,000. It was understood that if the purchase was not consummated within the time stated the two sums of $5,000 each paid to Friedman were to be forfeited.

On October 3, 1929, the purchase had not been completed. Thereupon Friedman and the surety company entered into a second written agreement. By it the surety company released all right to a credit on account of the $10,000 previously paid and agreed to purchase

the mortgage from Friedman for $56,000, of which $6,000 was to be paid on October 10th, $4,000 each month for eleven months, and a final payment on October 2, 1930, of $6,000, together with interest and taxes. Friedman agreed to retain control of the mortgage meanwhile and postpone proceedings for collection.

It may be noted that on September 4, 1929, the surety company gave a check to Friedman for $750, which he cashed and appropriated. What the nature of this payment was does not appear, but it was probably a bonus.

There was no evidence whatever to show any connection of appellant up to this point with the transaction just detailed, or even knowledge on his part that Friedman had consummated it.

The surety company, pursuant to its contract with Friedman, paid him by check the amounts called for by the agreement. The total amount paid Friedman by the surety company was approximately $69,000, including the original two payments of $5,000 each for extension of the mortgage. There was testimony by an auditor of the State Banking Department, who examined the records of the trust company after it was taken over by the department, that all this money passed through the bank. The disposition of part of it was shown; what became of the balance does not clearly appear.

The first payment under the agreement of purchase was $6,000, by check dated October 9, 1929. Friedman endorsed the check and cashed it, keeping $3,500 for himself as a bonus and remitting $2,500 to the trust company as a bonus. The monthly payments of $4,000 each and interest then began to be made. All except two of the checks were to Friedman's order and were endorsed by him in blank and turned over to appellant. Two of the checks were to the order of the Franklin Savings & Trust Company and were cashed by it. In each month, from November, 1929, to September, 1930, of the $4,000 plus interest which was paid, Friedman received a personal credit of $1,500 and interest, a total

of $17,141.25. Beginning in January, 1930, appellant Bardolph received personal credits of the balance of the surety company's monthly payments in January, February, March, April and June, 1930, a total sum of $12,896.51. What became of the aggregate balance paid by the surety company was not shown; the auditor testified that $19,500 of these funds could not be traced. The mortgage register, setting forth credits on the Hendel mortgage transaction, showed payments thereon during this period of $2,500 each month from June to September, 1930, a total of $10,000. The note representing Friedman's additional collateral loan of $50,000 contained notations that $12,500 was paid on its reduction on November 18, 1929, and an additional $2,500 on December 17, 1929, reducing it to $35,000. These may be accounted for on the assumption that the $10,000 bonus originally received by Friedman for the extension of the mortgage, in the summer of 1929, had been paid by him to the bank to be credited on one or the other of the two loans, and that there were likewise credited $2,500 out of each of the $4,000 payments in November and December, 1929. Beginning in January, appellant took these credits into his own account, until June, 1930, when four of these monthly credits were applied on the Hendel mortgage, as noted above. What distribution was made of the final payment of $6,000, made on October 6, 1930, was not shown.

The significant fact is, however, that up to January, 1930, payments were regularly being made by Friedman to appellant, as he received checks from the surety company, and not until then did appellant's first misappropriation occur. In his testimony upon a former trial on the charge of embezzlement, filed as part of the record herein, appellant testified that he had caused the credits to be made to his personal account because of a request that payments by the surety company be held "in suspense" and not applied to reduction of the Hendel mortgage loan. Now, however, his counsel admits that

appellant wrongfully misappropriated these funds and that there was no justification for mingling them with his own. Either the bank or Friedman was the ultimate loser, neither having since been reimbursed by appellant. But admitting the defalcation, we find nothing in the record before us to show collusion between Friedman and appellant up to the time when the latter began to misapply the funds he received. Nor, as we shall point out hereafter, is there any indication in the record that Friedman himself was guilty of any misappropriation.

In January, 1930, Ward, the president of the Pennsylvania Surety Corporation who had negotiated with Friedman the agreements relating to extension and purchase of the Hendel mortgage, retired from that company and a new president took office. Apparently he made inquiries as to the status of the Hendel mortgage payments, for in the record we find two letters to him written by appellant on April 29 and May 2, 1930, advising him that the bank would assign the mortgage to the surety company on payment of the balance of $26,000 due, and that it was satisfactory to the bank for the surety company to continue making payments through Friedman. At this time appellant must, of course, have known that the records of his bank showed a balance of $40,000 still due on the mortgage, no additional credits being applied thereon until the following June. It is obvious that at about the beginning of 1930 appellant had become familiar with the whole transaction and had begun appropriating to his own use part of the incoming funds which Friedman brought to him each month. But there is nothing which proves that Friedman was aware of appellant's peculations or was a party to them, or knew of appellant's correspondence with the surety company.

It was shown that during the entire period of these transactions Friedman dealt heavily with the bank and was largely indebted to it, on both the loans already re-

ferred to and on others. Nevertheless he continued to receive credits in his personal account from the moneys paid over by the surety company. Its final payment of $6,000 was made on October 6, 1930, and it had then fully complied with the terms of its agreement of purchase. On November 18, 1930, appellant assigned the Hendel mortgage of record to the Pennsylvania Surety Corporation. This was in accordance with his understanding previously reached in correspondence with its president, although the bank records still showed a balance of $30,000 due on the mortgage loan. Matters then remained in statu quo until July 20, 1931, when appellant, apparently for the purpose of covering the shortage, caused the bank to discount a note of Michael H. Parrish Company, Inc., for $29,624.31, from the paper proceeds of which $25,000 was credited on the Hendel mortgage loan, leaving a balance of $5,000 due. Of the balance of proceeds of the note, $2,245.88 was credited to appellant Bardolph's personal account and $2,378.43 to the Bardolph Investment Company, a corporation in which Bardolph was primarily interested. The Parrish company received none of the proceeds of the note, which was a bookkeeping entry, not a cash transaction. It was signed by Friedman as treasurer of the company. Appellant was its president. This company was engaged in highway construction and the note contained a notation to the effect that the collateral securing it consisted of an assignment of funds due it from the Commonwealth. Its discount was approved at a meeting of the directors of the bank, as noted in the minutes. However, the Parrish company eventually failed and the note proved to be worthless. Nothing was ever collected on it by the bank.

Nine days later, on July 29, 1930, the last credit on the Hendel mortgage loan appeared on the books of the bank; the remaining balance of $5,000 was paid off by appellant's personal check. The shortage, so far as appearances went, had now been made good.

The bank was closed on September 21, 1931, and the State Banking Department took over its affairs. Its examination disclosed the foregoing facts, and this was the Commonwealth's case. Do they so unerringly point to a conspiracy between appellant and Friedman to defraud the bank that the conviction can be sustained?

In dealing with a prosecution for conspiracy we recently said, in *Com. v. Benz,* 318 Pa. 465, 472, 178 A. 390: "An unlawful combination, like any other substantive fact, must be established by sufficient evidence. Where it is direct and positive, the question of sufficiency is answered. The jury may then pass on the credibility of the witnesses. But, when a charge of crime is sought to be sustained by circumstantial evidence, the hypothesis of guilt should flow from the facts and circumstances proved, and be consistent with them all. The evidence must be such as to exclude to a moral certainty every hypothesis but that of guilt of the offense imputed; the facts and circumstances must not only be consistent with and point to the guilt of the accused, but they must be inconsistent with his innocence: *Com. v. Bone,* 64 Pa. Superior Ct. 45; *Com. v. Byers,* 45 Pa. Superior Ct. 37; *Com. v. Kolsky,* 100 Pa. Superior Ct. 596. It is the duty of the trial judge, after the evidence of the Commonwealth has been fully produced, to determine as a matter of law whether the proof has been sufficient in volume and quality to overcome the presumption of innocence, and thus put the accused to a defense: *Com. v. Bone,* supra."

Our conclusion is that the proof on behalf of the Commonwealth in the case before us does not measure up to the exacting standard defined in the foregoing decision. The offense charged is an agreement between two or more individuals to cheat and defraud; appellant's admitted embezzlement was not the crime charged. Because of the close relationship in these cases between these two distinct offenses, a jury would be likely to return a verdict of guilty against him when charged with

conspiracy since his guilt of embezzlement was admitted. In cases of this character, the courts cannot permit proof of the commission of one crime to serve as proof of the commission of another and distinct crime. The Commonwealth showed facts susceptible of an interpretation that an unlawful collusion existed between Bardolph and Friedman, but the theory of such unlawful collusion is not *the only reasonable interpretation* of which those facts are susceptible.

Counsel for the Commonwealth particularly stress certain of the overt acts shown by the evidence as excluding any hypothesis but that of guilt. We cannot assign to them such high probative value. These facts either fail to demonstrate Friedman's collusive wrongdoing or tend to convict appellant of misappropriation only.

Thus it is said that Friedman agreed to sell the Hendel mortgage to the surety company, knowing it was not his to sell. But Friedman had a right to make this agreement and the surety company to rely upon his power to convey. All parties were fully apprised of the existing situation; it was not concealed in any way. Friedman undoubtedly believed that at the appointed time he could procure a conveyance by the bank. It is not unlawful to contract to sell something which the vendor does not yet possess. Every "short sale" of securities on a stock exchange is just such a contract or "gamble." Clearly Friedman intended to pay off his note at the bank with the funds paid him by the surety company and make a profit on the deal as well. There is nothing in the record to show that Friedman was cognizant in any way of what credits were or were not applied by the bank, out of the funds turned over by him to appellant, to the discharge of his $60,000 note upon which the Hendel mortgage was pledged as collateral. It is argued cogently by appellant's counsel that had the bank credited on that loan the original $12,500 payment of November 18, 1929, made by Friedman, and the

monthly sums of $2,500 and interest thereafter made from December, 1929, to September, 1930, $37,500 of the $40,000 balance due on the note would have been liquidated completely. The record fails to show what disposition was effected of the final payment made by the surety company on October 6, 1930. If it followed the course of the preceding payments, which Friedman had made with uniform regularity, the note would have been discharged in full. The record is barren of any proof indicating that Friedman in making monthly payments to appellant of $2,500 and interest, had any other thought than that appellant, with equal regularity, was causing these funds to be applied as credits on the note secured by the mortgage, or knew that this was in fact not being done. The facts show fraud and misappropriation on appellant's part but not on Friedman's.

An error in the rulings of the courts below is in holding that Friedman and appellant misapplied the bank's funds in failing to promptly apply the proceeds received from the surety company to the reduction of the $60,000 note, which had then been reduced to a $40,000 balance. Unquestionably, if Hendel, the mortgagor, had made payments on his mortgage debt, these could rightfully have been collected only by the pledgee: see *First Nat. Bank, to use, v. Getty, Exrs.*, 118 Pa. Superior Ct. 326, 179 A. 764; *Farmers National Bank v. Nelson*, 255 Pa. 455, 100 A. 136; *Cassler, to use, v. Cassler*, 294 Pa. 197, 144 A. 88. But the mortgagor made no payments. The only funds paid were by a party which had agreed to purchase the mortgage. Its agreement was with Friedman, not with the bank. It was content to rely upon Friedman's promise to have the mortgage assigned, and it had no dealings with the bank. The funds, when paid, were therefore Friedman's, not the bank's, and they did not become the bank's even when turned over to appellant, in the absence of a showing that payment to appellant was intended by Friedman as payment to the bank. Even were this considered proved, there is nothing to

incriminate Friedman in the fact that regular monthly credits were made to his account of $1,500 and interest. This serves to show no more than a direction on his part that a portion of his own money be credited to himself and the balance in discharge of his debt. An inference of collusion between appellant and Friedman, to the exclusion of other exculpatory inferences, is wanting.

As we have already noted, appellant's first connection with the transaction appears in the record of his diversion of funds to his own bank account beginning in January, 1930. In April he wrote to the surety company stating that the bank would assign the mortgage on payment of the balance of $26,000 remaining due. This would have been correct had the proper application of past payments been made, as appellant must have known. While appellant's malfeasance is obvious, the facts stated do not demand an inference of any conspiracy with Friedman to defraud the bank.

The circumstantial proof on which the Commonwealth relies to sustain the charge of Friedman's complicity in a plot with appellant amounts to this: (1) that Friedman was heavily indebted to the bank, on this and other obligations, throughout the period when the conspiracy is said to have existed; (2) that part of the proceeds of his contract with the surety company went regularly each month into his personal bank account; (3) that all the funds, or most of them, he paid to appellant directly, without taking the precaution, which would have protected him, of endorsing the checks to the bank; and (4) that he ultimately signed the Parrish company's note as treasurer and permitted the bank to discount it without making sure that the proceeds were credited to the company whose fiscal officer he was. These circumstances are strongly indicative of gross negligence and carelessness on his part, but they do not conclusively demonstrate his guilty collusion with appellant in carrying out a joint intent to defraud the bank. It cannot safely be asserted that the record be-

fore us excludes to a moral certainty every hypothesis but that of the appellant's guilt of the crime of conspiracy to defraud.

In the recent case of *Rosenblum v. Rosenblum et al.,* 320 Pa. 103, 181 A. 583, this court, speaking through Mr. Justice Linn, said, quoting from *Ballantine v. Cummings,* 220 Pa. 621, 631, 70 A. 546: " '. . . and when circumstantial evidence is relied on to prove the conspiracy its sufficiency must first be determined by the court. . . . If the testimony is direct and positive as a rule the question of sufficiency cannot arise, and in such cases it is for the jury to pass upon the credibility of witnesses and determine the fact by the weight of the evidence. When the testimony is not direct and positive, but where subsequent acts and circumstances are relied on to establish the conspiracy, a very different situation is presented. In such a case the first duty rests with the court to say whether the proven acts and circumstances, even if believed, are sufficient in law to establish in point of fact that the unlawful combination had been entered into by the parties charged, or two or more of them at some prior date. If the subsequent acts do not show, or tend to show, the prior unlawful combination and purpose, the very foundation of the action, it is clear the plaintiff has failed to make out his case and it is the duty of the court to say so.' See, too, *Vitagraph Co. v. Swaab,* 248 Pa. 478, 490, 94 A. 126; *Com. v. Benz,* 318 Pa. 465, 178 A. 390." In the same opinion the following is quoted with approval from the opinion of Mr. Justice Strong in *Benford v. Sanner,* 40 Pa. 9, 17: " 'The humane presumption of the law is against guilt, and though a conspiracy must ordinarily be proved by circumstantial evidence, yet it is not to be forgotten that the charge of conspiracy is easily made, and that in a race between creditors suspicions of unfairness are readily awakened. Mere suspicion, possibility of guilty connection, is not to be received as proof in such a case.' "

As was said in the case of *Com. v. Benz,* supra, "Here the evidence to connect the appellant, was wholly circumstantial. The facts which may be inferred from it did not exclude, to a moral certainty, every hypothesis but that of guilt [of the crime of conspiracy to cheat and defraud]."

The judgment of the court below is reversed and the defendant is discharged.