## Commonwealth v. Stethers et al.

*E. P. Young*, district attorney, and *C. E. Mills*, for Commonwealth.

*Lilley & Wilson*, for defendants.

### *Opinion and order*

CULVER, P. J., February 23, 1940.—Defendant Paul Stethers, together with J. V. Taylor, Jr., Arthur Carter, Louis Miller, Francis Irvine, and H. J. Little, were charged in two indictments, each of which contains several counts, with conspiracy. Indictment no. 20, September term, 1938, in the first count charged the said defendants with a conspiracy to unlawfully change and place certain ear tags, emblems, and markings in the ears of cattle for the purpose of misrepresenting and concealing the health of said animals to

the Department of Agriculture of the Commonwealth of Pennsylvania. The second count in that indictment charged them with a conspiracy to unlawfully change and place ear tags and emblems in the ears of certain cows with an intent to interfere with and deceive in the examining and testing, vaccinating, and selling of said cows.

The remaining counts in said indictment charged virtually the same offense but upon different dates.

Indictment no. 19, September term, 1938, in the first count charged a conspiracy to unlawfully, falsely, and fraudulently file false claims with the Commonwealth of Pennsylvania to obtain compensation for cattle that had reacted to Bang disease.

The second count in said indictment charged a conspiracy to unlawfully, falsely and fraudulently, wilfully and maliciously violate the act relating to domestic animals, and providing for their appraisement when about to be slaughtered to prevent the spread of Bang disease, to wit, the Act of June 22, 1931, P. L. 682, as amended by the Act of May 29, 1935, P. L. 259, and by the Act of May 6, 1937, P. L. 561.

The fourth count in the indictment charged a conspiracy to unlawfully, fraudulently and wilfully claim certain indemnities from the Commonwealth of Pennsylvania and to make demands for the payment of certain funds under a certain Pennsylvania plan for the prevention and control of Bang disease.

The other counts in the indictment charged virtually the same offense.

Section 7 of the Act of March 28, 1929, P. L. 110, relating to false tags, emblems, and markings, provides as follows:

"It shall be unlawful for any person knowingly and falsely to place, attach or use on an animal, or to cause to be so placed, attached or used on an animal, any tag, emblem or marking that misrepresents or conceals

the health of the animal, or to change, transfer or alter any tag, emblem or marking on an animal, or to cause any tag, emblem or marking on an animal to be changed, with intent to interfere or deceive in the examining, testing, vaccinating or selling of the animal."

Under the laws of Pennsylvania and the rules promulgated by the Department of Agriculture pursuant to authority given by such laws, and under the evidence in this case, it clearly appears that the State's first effort to eradicate diseases from cattle in Pennsylvania began many years ago, and the effort was to eradicate tuberculosis. In carrying out that law, the cattle of Pennsylvania were tested for tuberculosis, and when an animal reacted to the tuberculin test an ear tag bearing a certain number was permanently affixed to the ear of the animal, and report thereof was made to the Department of Agriculture at Harrisburg, the animal was ordered appraised and slaughtered, and the State paid the indemnity therefor. When an animal did not react to the tuberculin test, thereby showing it free from tuberculosis, an ear tag bearing a certain number was permanently affixed to the ear of such animal and a report thereof was made and a health chart bearing the number of the ear tag of such animal was issued. The only method of identifying the animal and the health chart issued for such animal was by the number of the ear tag so permanently affixed to the ear of such animal, and under the law and the rules of the Department of Agriculture that ear tag when so permanently placed could never lawfully be removed, but remained in the ear of the animal so long as it lived.

At a later date the legislature passed laws and the Department of Agriculture promulgated rules pursuant to the authority given by such laws, to eradicate Bang disease, which is a highly infectious and contagious disease, from the cattle of Pennsylvania and especially from the dairy cattle. These laws for the

eradication of Bang disease and the rules of the Department of Agriculture promulgated pursuant thereto prescribed the method of testing, quarantining, slaughtering, appraising, and paying indemnity for such animals as were affected with the disease, but no animal could be tested for Bang disease until it had been tested for tuberculosis and received a health chart showing it free from tuberculosis. The provisions of the law and rules of the Department of Agriculture providing for the quarantining of any animal affected with Bang disease in order that the disease might not spread are very strict and complete. When an animal was tested for Bang disease and found affected, a report of the animal, together with the number of the ear tag which it bore (being the ear tag placed in its ear when tested for tuberculosis), was reported to Harrisburg, and the animal was ordered appraised and slaughtered and indemnity therefor was paid in part by the State and in part by the Federal Government.

When an animal was tested for Bang disease and did not react to the test, thereby showing it free from such disease, a report of such animal giving the number of the ear tag which it bore (being the ear tag affixed to its ear when tested for tuberculosis) was reported to the Department of Agriculture at Harrisburg and a health chart bearing the same ear tag number was issued to such animal by the Department of Agriculture.

It is important clearly to understand that the only method of identifying cattle and health charts issued to them was by the number of the ear tag affixed to the ear of the animal. It is, therefore, plain and apparent that if those ear tags identifying the animal and the health chart issued to the animal were subsequently changed from one animal to another a wrong was done to the State, the identity of the animal and health chart was destroyed, and the door opened to perpetrate gross fraud upon the State.

To the above indictments all the defendants, except Louis Miller and Paul Stethers, entered pleas of guilty, and Stethers was tried and convicted at the September term of court last. Rules were taken for new trials, and at the argument of said rules counsel for defendant stated that their contentions were confined to two propositions:

"(1). The evidence in this case does not justify the reception of proof of the acts of alleged co-conspirators not shown to have been known to him.

"(2). The defendant should have been allowed to prove the facts about the difficulty of obtaining health charts in support of his explanation of why he had changed ear tags."

That Paul Stethers personally and through others acting for him, over the full period of time covered by these indictments, was continuously changing ear tags from one animal to another was established by overwhelming testimony and was admitted by Stethers. While Stethers concedes in the brief submitted that the changing of ear tags by his co-conspirators was done for the purpose of defrauding the State in obtaining indemnities for Bang-diseased animals, he alleges that insofar as he was concerned it was not done for the purpose of cheating or defrauding or deceiving the Department of Agriculture of the State of Pennsylvania, but was done only for the purpose of having his animals tested, so they might be shipped in interstate shipment. He alleges that inasmuch as, theoretically, every cow in the State of Pennsylvania had been tested for tuberculosis and carried an ear tag showing the animal and identifying her in the records of the Department of Agriculture in Harrisburg, no injury could be done the State by changing those ear tags from one animal to another. It is conceded that before a test for Bang disease could be had from the State there must have been a prior test for tuberculosis, which test

was evidenced and the animal identified only by the tag which was affixed to her ear, at the time the test was made, and it is conceded by all parties that under the law no one has a right to remove that tag or to transfer it to another animal.

We are satisfied that the contention of defendant is founded upon a false premise. It is true Dr. Rippon testified that theoretically all cows in the State had been tested for tuberculosis. However, it is apparent from the evidence in this case that every cow in the State had not been so tested and ear tags placed. There is evidence in this case that in numerous cases Paul Stethers, and those with whom he was acting, not only removed the ear tags from various animals and substituted others in their places, but the evidence shows there were a number of occasions wherein the animal bore *no* ear tag at all, and under such circumstances, from the supply of tags Stethers accumulated, he would select a tag and place it in the ear of such animal.

To say that this disreputable and nefarious practice could not in any wise injure the State is unreasonable. If every cow in the State of Pennsylvania, as a result of the great effort and expenditure of money the State has made over a period of years to eradicate tuberculosis, has been tested by the State and a health chart given and an ear tag placed in the ear of each individual animal for the purpose of identifying that animal and the health chart honestly belonging to it, then the State would have in its records, in the Department of Agriculture, an accurate and complete account of the condition and health, so far as tuberculosis is concerned, of every cow in the State. If, instead of acting honestly and in accordance with the provisions of the law, Paul Stethers and his co-conspirators from time to time were changing, transferring, and substituting those ear tags, it is perfectly apparent that the

integrity of the records at Harrisburg was thereby destroyed. As an illustration, let us suppose that two cows were tested by the State for tuberculosis and one was found to be diseased and one free from disease, and an ear tag was placed in the ear of the diseased one and report made to Harrisburg and a health chart showing the animal diseased was issued, and an ear tag was placed in the ear of the cow that was free from disease and a health chart accordingly issued and reported in the records at Harrisburg, then by a reference to the record the authorities at Harrisburg could readily tell which cow was diseased and which was not, and the manner of identifying the animals according to all the evidence in the case was by the number on the ear tag permanently attached to the ear of the animal.

Now, let us suppose that of these two cows Mr. Stethers removed the ear tags and transferred them from one to the other. Then the diseased cow would carry the ear tag and health chart of the healthy one, and the healthy cow would carry the ear tag and health chart of the diseased one, and if the healthy cow was slaughtered and report made to Harrisburg the healthy cow carrying the ear tag of the diseased one would be reported and the records at Harrisburg, instead of showing the true state, would show directly the opposite. If the diseased cow was slaughtered while carrying the ear tag of the healthy cow and report of that tag was made to Harrisburg, again the records at Harrisburg would show exactly the opposite from the true facts. To further illustrate how the State could be and would be injured, let us suppose a test was made by the State for Bang disease and the ear of the first cow tested carried an ear tag which when referred to the records at Harrisburg would show her free from tuberculosis, when, as a matter of fact, according to the previous transfer of tags, she was not free from tuberculosis.

If that animal reacted to Bang disease and was condemned and appraised and the State paid her value, the State would then be paying an indemnity by reason of Bang disease on what it supposed and what its records showed to be an animal free from tuberculosis. Again, let us suppose that a purebred cow in a test made by honest representatives of the State reacted to Bang disease and a claim for indemnity was made. After the test showing the animal suffering from Bang disease and so reported to Harrisburg, suppose the ear tag be transferred from that purebred cow to a bologna or junk beef cow whose value according to the evidence ranged from $10 to $25, and instead of slaughtering the purebred cow that had been tested and condemned the bologna or junk cow was substituted and slaughtered, then the State would be paying an indemnity for the slaughtering of a purebred cow, when, as a matter of fact, the cow actually slaughtered was a bologna cow of little value.

It may be answered that this could not occur because the representative of the State making the appraisement could readily determine that the bologna cow slaughtered was not the purebred cow that had been tested and condemned. This would be true, were it not for the fact that Dr. H. J. Little, who represented the State in making the appraisements, was a member of this conspiracy in acting, aiding and abetting in carrying out the fraudulent scheme, and was appraising bologna and junk cows at the values the State allows for purebred cattle. As a matter of fact, this is what was done in many cases, and before this conspiracy was discovered the State had paid thousands of dollars on that kind of fraudulent claim to Taylor, Little, and the other co-conspirators. Whether it had paid any to Stethers or not is immaterial, if Stethers was a party to the scheme and was acting with them in carrying it through.

Taking Stethers' contention, let us suppose that he had a cow which he desired to ship to New Jersey, and for the purpose requested the State to test the same for Bang disease and the State by one of its honest testers made the test and found the animal suffering from Bang disease and placed in its ear the identification ear tag and made the report to the central office at Harrisburg. If Stethers, or anyone else, could thwart the efforts of the State by the simple method of removing from the ear of the tested cow the tag which the State had placed therein and substituting the ear tag of a cow that had been tested and reported to the State as free from Bang disease, what would stand in the way of shipping a diseased cow then carrying the ear tag and health chart of a healthy cow into the State of New Jersey or elsewhere? The argument that the State could not be in any wise injured by this promiscuous changing and substituting of ear tags, placing in the ears of diseased animals ear tags showing them to be free from disease, seems unreasonable, and in our judgment is unreasonable, and by the admitted conduct of this defendant he has, by the changing of ear tags in the many animals which he admitted he did change, destroyed the integrity of the State's record in the Department of Agriculture, so that at the present time the record at Harrisburg, as to every cow in which ear tags have been changed, is rendered incorrect, misleading, and deceptive.

Defendant's contention that he was justified in changing ear tags because he experienced difficulties at times in getting health charts from the State must likewise fall. There can be no justification in law or in honesty in the doing of any act which placed a diseased cow in the class of healthy cows and gave her falsely a health chart which had been issued to a healthy cow. We are, therefore, satisfied that we made no mistake in refusing to permit defendant Stethers to testify as to why he changed the ear tags. No matter

what his explanation may be, it was an illegal act and the sure inevitable result would be to mislead, deceive, and, in many instances, defraud the State, as well as individuals to whom the animals were thus wrongfully transferred. We fully appreciate that the fact that Stethers did these unlawful acts would not of itself make him guilty of the crime of conspiracy, but if he did these unlawful acts by reason of and in carrying out a corrupt and fraudulent agreement and understanding with Taylor, Carter, Irvine, Miller, Little, or any of them, then it did amount to conspiracy, and we are satisfied the evidence in the case is wholly sufficient to warrant the jury in finding that he did so conspire with the other defendants. . . .

Francis Irvine and Louis Miller each testified that they were employed by the Wyalusing Livestock Company, which was J. V. Taylor, Jr., and Paul Stethers; that they took orders from both members of the firm and that they purchased cattle for the firm.

Stethers denied that either of these men had ever been employed by the Wyalusing Livestock Company of which firm he was a member and alleged that each of them was employed by J. V. Taylor, Jr., individually. While we do not consider it important by whom they were employed, we believe the evidence was amply sufficient to justify a finding that they were employed by the Wyalusing Livestock Company and were buying livestock for that company.

The Commonwealth offered in evidence an application made by J. V. Taylor, Jr., and Paul Stethers, trading as the Wyalusing Livestock Company, for a dealer or broker's license for the years 1937 and 1938.

In the first application Francis Irvine and Louis Miller were named as their agents.

The second application named no one as agent.

Under the provisions of the Act of June 22, 1931, P. L. 650, sec. 3, as amended by the Act of May 14,

1937, P. L. 628, sec. 1, the Wyalusing Livestock Company was obliged, in order to conduct its business, to have a license from the Department of Agriculture authorizing them to act as dealers or brokers and in that application they were obliged to name the persons who were their agents, etc. The act provides as follows:

"Each dealer or broker, engaged in such business for the purposes aforesaid, shall, annually, on or before December first, file an application with the department for a license to transact such business. The application shall state the nature of the business as herein above set forth, the breed, classes or kinds of animals which the applicant proposes to handle, the name or names of the person or persons applying for the license, and, if the applicant be an association, partnership or corporation, the full name of each member of such association or partnership or the names of the officers of the corporation, and the name of each agent of such dealer or broker, and the city, borough, town or township and the post office address at which the business is to be conducted.

"The applicant shall further satisfy the department of his or its character and good faith in seeking to engage in such business. The department shall thereupon issue to such applicant a license, entitling the applicant to conduct the business of acting as a dealer or broker, as in this act defined, at the place named in the application until the thirty-first day of December next following, and to each of his or its agents, a license to act as agent for such dealer or broker until the thirty-first day of December next following.

"Each dealer or broker applying for a license, under the provisions of this act, shall accompany his or her application with a license fee of five dollars ($5.00) and an additional license fee of one dollar ($1.00) for each of the agents of such dealer or broker."

Section 2 of the same act provides as follows:

"On and after December thirty-first, one thousand nine hundred and thirty-one, no dealer or broker shall engage in or carry on business as such unless duly licensed as hereinafter provided. No agent shall act for any dealer or broker unless such dealer or broker is duly licensed, and has designated such agent to act in his behalf and notified the department in his application for license, or given official notice in writing, of the appointment of such agent and requested the department to issue to such agent an agent's license. Such dealer or broker shall be accountable and responsible for the contracts made by said agent." (Section 2.)

And section 1 of the Act of June 22, 1931, declares that a dealer or broker is:

". . . any person, copartnership, association or corporation engaged in the business of buying, receiving, selling, exchanging, negotiating, or soliciting the sale, resale, exchange or transfer of any animals . . ."

Therefore, when the Wyalusing Livestock Company filed its application for such broker or dealer's license, it was an acknowledgment upon its part that it was buying and selling and dealing in cattle. In our judgment, this documentary evidence supplemented by the parol testimony of Irvine and Miller that they were employed by the Wyalusing Livestock Company and were its agents in buying livestock for it and that they did buy livestock for it, some of which livestock so purchased by them was the livestock in which ear tags were changed, etc., was sufficient to justify the jury in so finding, notwithstanding Stethers' denial thereof, as his credibility was for the jury.

The evidence in this case shows that J. V. Taylor in company with Francis Irvine on two occasions went to Binghamton, New York, and there obtained a serum which, when injected into the blood stream of a cow,

would cause her to react as a Bang diseased cow. Irvine testified that after getting this serum he saw Paul Stethers injecting serum from one of the bottles into animals. Stethers denied that he had any knowledge of the Bang disease serum having been obtained and stated that the serum he injected into his animals was a serum to prevent shipping fever; that it was a common practice and a proper one. Whether Stethers had an understanding with Taylor and the others to inject Bang disease serum into cows so that they would react, or whether he did not, we do not consider important, but there is evidence in the case which would justify the jury in so finding. . . .

The question may suggest itself as to why Taylor and his co-conspirators would be desirous of injecting a virus into healthy cattle that would cause them to react to a Bang disease test. If they were acting honestly, there could be no reason for such conduct, but if, as shown in this case, they were acting together in a fraudulent scheme to defraud the State of Pennsylvania and the Federal Government by obtaining indemnities for reactors to Bang disease and had among their co-conspirators Dr. H. J. Little, who was representing and supposed to be guarding the interests of the State, and he was appraising bologna and junk cows at purebred cow prices, then it is easy to understand how it would be advantageous to Taylor and those acting with him to have a virus which he could inject into bologna and junk beef cattle and then ask for a test by the State authorities, which test would be made by honest employes of the State who were ignorant of the conspiracy and, when the cattle would react, they would give a certificate showing the ear tag number of the cows which did react and then the State would send Dr. Little to appraise the cattle, and each junk and bologna beef cow so tested having at the time of the test borne an ear tag that was originally issued

to a purebred cow, which ear tag the honest testers certified to the Central Office at Harrisburg, the way was open for the selling of a junk cow and receiving indemnity for a purebred cow, and if the authorities at the Harrisburg office checked the ear tag of the tested cow as returned by the State testers they would find it the ear tag belonging to a purebred cow which justified the appraisement Dr. Little made of many times the value of the cow actually tested and slaughtered.

This case has so many ramifications and the fraudulent and dishonest schemes which were being carried out in a gigantic swindle of the State and Federal Government, it is shocking and almost beyond the understanding of honest people. We have mentioned but few of the dishonest acts and schemes that were being carried out admittedly by the co-conspirators of Paul Stethers. Instance after instance was proved in the case where J. V. Taylor, Jr., had forged and transferred certificates and titles of purebred cattle in lining up the herds to be inoculated and tested and indemnity sought from the State and Federal Government. It is not contended that Paul Stethers participated in those acts, or at least many of them, but it is contended, and we believe the evidence abundantly shows, that he was acting with Taylor; that he was Taylor's partner in the business of buying and selling at the stable; that he and Taylor were discussing the changing of ear tags and injecting of Bang disease virus, and substituting health charts, and doing the many illegal and dishonest acts disclosed by the testimony, and we are satisfied that the evidence as a whole amply justified the jury in finding that Stethers was acting in concert with the co-conspirators named in the indictment to the extent that their acts and conduct were evidence against him.

Defendant's counsel in their brief cite and rely upon Commonwealth v. Bardolph et al., 326 Pa. 513. We

fully recognize the validity of this authority, but consider it as not governing the instant case. In that case there was no direct or positive evidence of a conspiracy on the part of defendant. The evidence showed that defendant was an embezzler and from that fact and certain transactions that he had with the other party the jury was allowed to infer that they were acting according to an agreement and understanding. The Supreme Court held that the evidence was not sufficient to justify such finding. In that case the evidence was wholly circumstantial. But the court quoted with approval from Ballantine v. Cummings, 220 Pa. 621, 631, the following:

"If the testimony is direct and positive as a rule the question of sufficiency cannot arise, and in such cases it is for the jury to pass upon the credibility of witnesses and determine the fact by the weight of the evidence."

In the instant case we have both circumstantial and direct and positive evidence. We have the admitted co-partnership between Paul Stethers and J. V. Taylor, Jr., who it is admitted were partners in conducting a sales barn at Wyalusing, where sales of livestock were held each two weeks on which sales Taylor and Stethers received a commission of five percent. Irvine and Brown testified they were employed by Stethers and Taylor, and that they assisted at the time of sales. Stethers denied that they were ever employed by him and alleged that they were employed by Taylor alone. The application for a license to Wyalusing Livestock Company was made to the State of Pennsylvania, in which one of these men was named as buyer for the Wyalusing Livestock Company (Taylor and Stethers).

Another application for the following year was placed in evidence in which no one was named as buyer. Stethers denied that he had any knowledge that either of these two men was named in the first application

and denied that either was ever employed by him. Pursuant to the first application, a license was issued to Irvine by the State. They both testified that their understanding was that they were employed by both Taylor and Stethers; that they took orders and instructions from both Taylor and Stethers and that they bought numerous animals and delivered them at the sales barn. Whether they were employed by Taylor and Stethers or by Taylor alone, we do not consider important; they were familiar with the activities of both Taylor and Stethers; they participated in the sales at the sales barn; they assisted in changing ear tags many times at the direct command of Stethers and oftentimes with Stethers assisting them in so doing. They testified about what they had seen and heard Stethers and Taylor talk and as to conversations between Stethers and Taylor and it was all placed before the jury in a manner to which defendant makes no complaint further than to complain that the court was in error in receiving evidence as to the acts and declarations of the co-conspirators upon the theory that Stethers was not shown by sufficient evidence to be a part of the conspiracy. We are not convinced that we were in error in that respect.

There was direct and positive evidence that in a number of instances applications were made to the State for blood tests on different herds alleged in the applications to belong to and be the property of Arthur Carter and there was positive evidence that Arthur Carter was not the owner of said herds or of any cattle whatever.

There was direct and positive evidence that applications were made to the State for blood tests and that interstate shipments were made to New Jersey, in different instances, of herds alleged in the applications to belong to and be the property of James Brown. There was positive evidence that these cattle did not belong to

James Brown and that James Brown was not the owner of any cattle at all, but the same belonged to Paul Stethers. Brown testified that he knew Stethers was using his name in the first two or three instances, but he had no knowledge whatever of his name being used in the other applications by Stethers.

By the exhibits offered in evidence it was established that ear tags bearing certain specific numbers were in different instances found in the applications for blood tests and for indemnity by Arthur Carter (for the herds actually owned by J. V. Taylor, Jr.) and that these same ear tags were found in other applications for blood tests and in interstate shipment of cattle belonging to Paul Stethers . . .

There was direct and positive evidence in the case that Taylor and Stethers together at different times discussed the changing of ear tags and the reasons why they were changed, i. e., in some instances they were changed because in shipping cattle into the State of New Jersey there was a requirement that there must have been a previous tuberculosis test, and when it was desired to ship cattle into New Jersey there were occasions where the animals bore no ear tags evidencing that they had been tuberculosis tested, and in such instances tags of animals that had been tuberculosis tested were placed in their ears.

When the great mass of direct, documentary, and oral testimony in these cases is considered, we have no doubt that it was amply sufficient to justify the jury in finding that defendant Paul Stethers was acting by agreement and with an understanding between himself, J. V. Taylor, Jr., Francis Irvine, Dr. H. J. Little, and Arthur Carter for the purpose of violating the laws of the State and the rules and regulations promulgated by the Department of Agriculture and to violate the laws governing interstate shipments and providing for tests and indemnities for cattle suffering with Bang disease.

## Order

And now, to wit, February 23, 1940, after due and careful consideration of defendant's motion for a new trial in no. 19, September term, 1938, in the Court of Quarter Sessions of Bradford County, the rule is dismissed, and a new trial is refused. An exception is noted and a bill sealed for defendant, and defendant's rule for a new trial in no. 20, September term, 1938, in the Court of Quarter Sessions of Bradford County is dismissed. An exception is noted and a bill sealed for defendant.